IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 21, 2003 Session

## KATHLEEN ANNE EARLEY v. ROBERT KEITH EARLEY

**A Direct Appeal from the Circuit Court for Shelby County**
**No. CT-003076-00     The Honorable John R. McCarroll, Jr., Judge**

---

**No. W2002-01354-COA-R3-CV - Filed August 26, 2003**

---

In this divorce case, the final decree granting wife a divorce made a division of marital property but failed to include as part of the marital estate several expenditures made by the husband. Wife asserts that such expenditures constitute a dissipation of assets by the husband and should have been included as part of the marital property. Wife appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

David E. Caywood, Laurie W. Hall, Memphis, For Appellant, Kathleen Anne Earley Earley

Michael L. Robb, Dawn Davis Carson, Susan T. Hunt, Memphis, For Appellee, Robert Keith Earley

### OPINION

Appellant Kathleen Anne Earley ("Wife") and appellee Robert Keith Earley ("Husband") were married in Elmont Long Island, New York on September 29, 1973. The parties separated on May 7, 2000.[1] Throughout most of the marriage, Husband served as the sole financial provider, and Wife acted as the primary caregiver and homemaker.

Husband was hired as Vice President of Distribution for Williams-Sonoma Corporation ("Williams-Sonoma") in June 1983. In July 1984, Husband was transferred from Williams-Sonoma's offices in California to the corporation's distribution center in Memphis, Tennessee. Husband was eventually promoted to the position of Senior Vice President of Distribution.

---

[1] The parties have two daughters together. Both daughters were eighteen years of age or older at the time the trial court's Final Decree of Divorce was entered.

In addition to his annual salary as Senior Vice President of Distribution, Husband was also awarded a ten percent interest in the Hewson-Memphis Partnership in the early 1990's. The Hewson-Memphis Partnership was a partnership that owned the land and building where Williams-Sonoma's Shelby County distribution center was located. Husband maintains that the interest he received in this partnership was a "gift," and not an element of his annual compensation from Williams-Sonoma.

Shortly after his arrival in Memphis, Husband entered into a business agreement with Bill Norris to form Professional Transportation Services, Inc. ("Pro Trans").[2] Husband testified that he was a silent partner in Pro Trans, and as such was entitled to a fifty percent share of the corporation profits. According to Husband, Pro Trans generated very little profit in its early years of inception. However, as the business continued to grow, Husband testified that the corporation's profit margin increased to between $90,000.00 and $200,000.00 per year. Husband testified that Wife knew about Pro Trans, and further insists that his family benefitted financially from his interests in the corporation.

As an executive employee of Williams-Sonoma, Husband was required to sign a Yearly Officer's Statement and truthfully answer several questions, including inquiries regarding outside business interests. Husband admits that he was required to reveal his interests and involvement in Pro Trans; however, despite this knowledge, he consciously chose not to reveal this information in violation of Williams-Sonoma policy.[3]

In February 1993, Husband began an extramarital affair with his Williams-Sonoma co-worker, Bobbye Payne ("Ms. Payne"). Husband admitted to purchasing jewelry, trips, various household goods, and a residence for Ms. Payne with marital funds during his marriage to Wife. Husband further admitted to paying several of Ms. Payne's debts or bills with marital funds. He calculated the total "agreed dissipation" amount at $440,233.97.[4] At the time of trial, Husband and Ms. Payne were still involved.

Husband resigned from Williams-Sonoma in January 1997. In early 1999, Williams-Sonoma filed a complaint against Husband and Ms. Payne in the United States District Court for the Western

---

[2] Pro Trans was created as a freight forwarding corporation. Williams-Sonoma was a Pro Trans client.

[3] Husband contends that he did not reveal his involvement in Pro Trans because he considered Pro Trans a "stock investment" rather than a business interest, on the basis that he had no responsibility for the day-to-day operations of the corporation.

[4] At trial, an Agreed Dissipation list was entered as an exhibit. This list represents the total amount by which Husband dissipated the parties' marital assets through gifts and payments to Ms. Payne.

District of Tennessee, alleging corporate theft.[5]  Williams-Sonoma's First Amended Complaint, entered as a trial exhibit in this matter, alleged eight causes of action against Husband, to wit: (1) conversion; (2) money had and received; (3) fraud; (4) conspiracy to defraud; (5) unjust enrichment; (6) breach of fiduciary duty; (7) fraud, in connection with the Settlement Agreement and General Release of July 5, 1997; and (8) rescission of contract.[6]  Williams-Sonoma later filed an amendment to its First Amended Complaint, alleging a ninth cause of action against Husband for unjust enrichment and breach of fiduciary duty.  Pursuant to this ninth cause of action, relating to Husband's interest and involvement in Pro Trans, Williams-Sonoma alleged:

> As a direct and proximate result of Earley's breach of his fiduciary duty as herein alleged, Earley has received substantial benefits which constitute secret profits and which have a value of at least $2,000,000.00 in the form of distributions and benefits paid or provided to him by ProTrans.  Earley is fully liable to Williams-Sonoma for all such secret profits that he obtained in violation of his fiduciary duties.  The exact amount of Earley's secret profits will be proven at the time of trial.[7]

Husband retained the Memphis law firm of Armstrong Allen to represent him in the Williams-Sonoma suit.  On December 10, 1999, Husband and Williams-Sonoma entered into a Mutual Release and Settlement Agreement in the above cited action.  The Settlement Agreement provided:

> Not later than twenty (20) days following the full execution and delivery of this Release by the parties hereto, Earley shall cause the sum of $4 million Dollars ($4,000,000) (the "Settlement Amount") to be wire transferred in immediately available funds to the account of Williams-Sonoma in accordance with the wire transfer instructions provided by Williams-Sonoma.  Additionally, Earley will

---

[5] Williams-Sonoma specifically contended that Husband and Ms. Payne "diverted Williams-Sonoma corporate funds for their own personal use and benefit."  According to Williams-Sonoma's First Amended Complaint, Husband opened an unauthorized corporate account at a Memphis bank.  Husband placed the account in the name of "Williams-Sonoma, Inc. Employee Fund."  The account was referenced to Husband's own social security number, and he received all account statements at his private residence.  Williams-Sonoma alleged that Husband funded the account with Williams-Sonoma money, and further asserted that Husband "wrote checks, drawn on the unauthorized account, to cash, to himself and to defendant Payne, and to other persons and entities, as payment for his and defendant Payne's respective personal expenses and for their respective personal benefit."

[6] Ms. Payne was included as a defendant only as to Williams-Sonoma's actions for conversion, money had and received, fraud, conspiracy to defraud, and unjust enrichment.

[7] In her testimony before the trial court, Wife admitted that she knew about Pro Trans, but denied any knowledge that Husband's participation in this corporation was a violation of Williams-Sonoma policy.  Wife further denied any knowledge regarding the unauthorized and illegal "Employee Fund" established by Husband.

donate his 10% interest in the Memphis Hewson partnership to a qualified charity of Williams-Sonoma's choice....

This agreement further specified that the $4,000,000.00 paid by Husband represented a "return of compensation" as to Williams-Sonoma's ninth cause of action for breach of fiduciary duty.

The Settlement Agreement between Husband and Williams-Sonoma included the signatures of Wife, and the parties' children. With regard to her knowledge of the litigation and settlement agreement details, Wife admitted that she and Husband discussed the lawsuit during its pendency, and further conceded that, at the suggestion of Husband's attorney, she spoke with attorney Brook Lathram ("Mr. Lathram") on one occasion regarding the Williams-Sonoma lawsuit.[8] Wife noted, however, that she did not speak with Husband about the Settlement Agreement prior to signing it, and further asserted that she was never advised of the possibility that this agreement could be used against her interests in a future divorce proceeding. Wife acknowledged that she did not read the Settlement Agreement prior to affixing her signature.

When questioned as to whether he explained the terms and consequences of the Settlement Agreement to Wife prior to giving final approval to the agreement, Husband testified:

> Q: And did you talk to her about the settlement when that issue came up?
>
> A: Yes. We went to mediation in Dallas. Dallas, Texas was the site that Williams-Sonoma insisted that we meet in. And when we – when we arrived at a mediation number or an agreement number, I called Kathy and explained to her what the number was, how much Williams-Sonoma stock we would have to sell in order to meet that number and also explained the – that we – what assets we would have left.
>
> ****************************************************
>
> Q: Did she agree with [the Settlement Agreement]?
>
> A: Yes, she did.
>
> Q: Did you tell her about also the charitable gift of the partnership?
>
> A: Yes, I did.

---

[8] Wife testified that she only met with Mr. Lathram once, and stated that she did not speak with him at any time after the Settlement Agreement was reached or prior to her signing of said agreement.

Q: Did she know all the terms about the settlement?

A: Yes.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q: Did you make a specific point of calling her before you consummated the mediated settlement?

A: Yes, I did. I wanted her to understand about the settlement and to – to get her approval basically.

In addition to these assertions, Husband further maintained that Wife was aware that he was using marital funds to pay his attorney's fees in the Williams-Sonoma litigation.

On June 12, 2000, Wife filed a Complaint for Absolute Divorce and Injunctive Relief in the Circuit Court of Shelby County, Tennessee. Wife sought a divorce on the grounds of irreconcilable differences and, in the alternative, inappropriate marital conduct and adultery.[9] Pursuant to her Complaint, Wife asked the court for a fair and equitable distribution of the parties' marital assets, such distribution taking into consideration Husband's alleged dissipation of marital property.[10]

---

[9] In her Complaint, Wife also sought alimony pendente lite and alimony *in futuro*. On September 12, 2000, Wife filed a Motion Pendente Lite for alimony, child support, and attorney's fees. On March 12, 2003, after the trial court entered its Final Decree of Divorce and Wife filed a Notice of Appeal of the court's order, this Court entered an Order stating that it did not have jurisdiction to hear the appeal as the trial court's decree was not a final order. In support of our finding, this Court noted that there was nothing in the record to show that the trial court adjudicated Wife's claim for alimony. As a result, this Court dismissed Wife's appeal.

Wife filed a Petition for Rehearing with this Court on March 24, 2003. The petition, unopposed by appellee, acknowledged that Wife asked for alimony in her original complaint. However, despite her initial pleading, Wife cited to an exchange between the trial court and appellant, documented in the trial transcript, where "it was stipulated Appellant was not seeking any rehabilitative or periodic alimony." On this basis, Wife asked this Court to "remand the issue of the alimony claim back to the Trial Court so that an appropriate Order might be entered in the Trial Court adjudicating the claim for alimony based upon the stipulation of the parties."

Soon thereafter, this Court entered an Order giving Wife thirty days in which to supplement her petition with a trial court order adjudicating her claim for alimony. Wife supplemented her petition in compliance with this Court's Order on April 8, 2003. Attached to her petition was a Consent Order Amending Final Decree of Absolute Divorce, filed in the trial court, stating that the court's May 2, 2003 decree "should be amended to add that Plaintiff was not awarded any alimony by the trial court." The following day, this Court entered an Order vacating its March 12, 2003 Order in its entirety.

[10] The dissipation argument asserted in Wife's Complaint is premised on appellant's allegation that Husband "gave, conveyed and otherwise transferred substantial property and funds [to Payne] which far exceeded a quarter of a million dollars, which funds were, in fact, marital property and/or property of another," thereby constituting a dissipation of the parties' marital assets.

-5-

Husband filed a Motion to Stay Divorce Proceedings in the trial court on February 23, 2001. As the basis for his motion, Husband asserted that he was at that time a target of a federal criminal investigation. In support of this motion, Husband filed the Affidavit of Kemper B. Durand, his attorney in the criminal matter. Mr. Durand averred that he advised Husband not to answer any questions posed in the course of a civil proceeding that "could be the subject of the criminal investigation or subsequent charges."

On June 8, 2001, Husband filed an Answer and Counter-Complaint. In his Answer, Husband admitted Wife's alleged grounds for divorce, and further acknowledged his extramarital relationship with Ms. Payne. Husband moreover admitted "transferring some property" to Ms. Payne, but did not admit to the monetary value of the property transferred. Husband thereby asked the court to grant a divorce on the grounds of irreconcilable differences. In the event that the parties could not reach a marital dissolution agreement, Husband asked that he be allowed to proceed with his Counter-Complaint which sought a divorce on the grounds alternatively, of inappropriate marital conduct.

A non-jury trial was held from February 25, 2002 through February 26, 2002.[11] Prior to trial, Wife filed an Affidavit of Income, Expenses, Assets, and Liabilities and a Memorandum.[12] Husband, in turn, also filed a Rule 14(D) Memorandum. A Final Decree of Absolute Divorce was entered in the trial court on May 2, 2002. In its Order, the court declared the parties divorced pursuant to T.C.A. § 36-4-129, and, regarding division of marital property, stated:

> The marital property shall be valued as set out below, and the Court finds the total value of the marital estate is Three Million Seven Hundred Thirty-Eight Thousand Eight Hundred Fifty-Four Dollars and Sixteen Cents ($3,738,854.16). The marital property shall be divided equally, but wife shall receive an additional Five Hundred Thirty-Three Thousand One Hundred Forty-Five Dollars and Seventy-Four Cents ($533,145.74) because of Husband's dissipation of marital assets in that amount. In summary, Wife shall receive Two Million One Hundred Thirty-Five Thousand Nine Hundred Ninety-Nine Dollars and Ninety-Five Cents ($2,135,999.95) of the marital property more specifically set out below and Husband shall receive One Million Six Hundred Two Thousand Eight Hundred Fifty-Four Dollars and Twenty-One Cents ($1,602,854.21) of the marital property as described below.

---

[11] Husband moved for a continuance on the ground that he would be prejudiced by the pending criminal proceedings but the trial court denied.

[12] These documents are required by Rules of Practice and Procedure 14 (c) and 14 (d), Circuit Court for the Thirtieth Judicial District at Memphis.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Court finds that Wife did not dissipate any marital assets and the Court further finds no further dissipation of marital assets by Husband other than the Five Hundred Thirty-Three Thousand One Hundred Forty-Five and Seventy-Four Cents ($533,145.74) referred to herein above.

Although the court did not specifically detail in its Final Decree how it arrived at the dissipation total of $533,145.74, the trial judge's commented from the bench:

All right. I think that the dissipation numbers that I gave you as far as the issues with Mrs. Payne – or Ms. Payne – are the correct numbers. And those numbers being the 440,233.97 that's on Exhibit 27 [Agreed Dissipation List].

The Court further finds that 85,298 dollars and 48 cents worth of jewelry was purchased for Ms. Payne, and I think I've gone through the recitation of how I came up with that number, but I'll do it again just so we have everything right in the record.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Further, I think that there is an additional dissipation of 7,613 dollars and 28 cents. I went through Exhibit 11 previously, and I told you how I arrived at that number, and going through the various items, broke down exactly how I came up with the number, but the number is 7,613.28.

The court further noted:

The real issue for me is whether or not then to add the $207,277.50 in attorney fees that were paid in connection with the civil suit to the dissipation. And I find that the civil – preparation for defense of and settlement of the civil suit was something Ms. Earley knew about all along.

It is certainly not a commendable course of action that gave rise to the civil case, but I don't think that it amounts to legal dissipation, so I'm not going to include the $207,277.50 in the dissipation figure. Therefore, the figure I come up with for the amount that was dissipated is 533,145 dollars and 74 cents [$533,145.74].

The record reflects that the court did not factor Husband's ten percent interest in Hewson-Memphis Partnership, the $4,000,000.00 payment to Williams-Sonoma pursuant to the Settlement Agreement, and the above noted attorney fees into the dissipation total.[13]

Wife appeals, presenting the following issue for review, as stated in appellant's brief:

> Did the trial court err in holding that the Four Million Dollar ($4,000,000.00) return of compensation to Williams-Sonoma, the donation of Mr. Earley's ten percent (10%) interest in Hewson-Memphis Partnership to charity valued at Two Million, One Hundred Eighty Seven Thousand ($2,187,000.00), and the attorney's fees spent by Mr. Early in his defense of the Williams-Sonoma lawsuit totaling Two Hundred Thirty-Three Thousand, Eight Hundred Nineteen Dollars and Fourteen Cents ($233,819.14) were not a dissipation of marital assets?

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

Although there is a presumption that marital property is owned equally, there is no presumption that marital property should be divided equally. *Bookout v. Bookout*, 954 S.W.2d 730, 31 (Tenn. Ct. App. 1997). Thus, an equitable division of the marital property need not be an equal division of the property. *Id*. A trial court is afforded wide discretion when dividing the marital property, and its distribution will be given "great weight" on appeal. *Ford v. Ford*, 952 S.W.2d 824, 25 (Tenn. Ct. App. 1997). Guidelines for the equitable division of marital property are set forth in T.C.A. § 36-4-121 (c) (Supp. 2002). Among the factors to be considered by the court in making an equitable division of marital property is the "contribution of each party to the acquisition, preservation, appreciation, ***depreciation or dissipation of the marital or separate property***, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role." *See* T.C.A. § 36-4-121(c)(5) (Supp. 2002) (emphasis added).

This Court set forth the standard for determining whether a party to a divorce action is guilty of dissipating marital assets in *Ward v. Ward*, No. W2001-01078-COA-R3-CV, 2002 WL 31845229, at *3 (Tenn. Ct. App. Dec. 19, 2002). We quote at length from the *Ward* decision:

---

[13] Exhibit 11 includes a "Dissipation of Marital Assets" list compiled by Wife with regard to her allegations of dissipation against Husband. Included in this list is the $4,000,000.00 wire transfer from Husband to Williams-Sonoma, Husband's ten percent interest in the Hewson-Memphis Partnership valued by Wife at $2,187,000.00, and various fees advanced by Husband to Armstrong Allen for payment of legal services rendered in the Williams-Sonoma litigation.

The court notes dissipation is not defined in [T.C.A. § 36-4-12(c)].  In such circumstances, courts must look to the plain language of the statute and apply the ordinary meaning of the words.  ***Cohen v. Cohen***, 937 S.W.2d 823, 827 (Tenn. Ct. App. 1996).  "Dissipate" is defined "[t]o destroy or waste, as to expend funds foolishly."  Black's Law Dictionary 473 (6th ed.1990).   This Court finds instructive an article by Lee R. Russ examining how courts around the country have dealt with the difficult task of making the fine-line distinction between dissipation and discretionary spending.  ***See*** Lee R. Russ, ***Annotation, Spouse's Dissipation of Marital Assets Prior to Divorce as a Factor in Divorce Court's Determination of Property Division***, 41 A.L.R. 4th 416 (1985).  Trial courts must distinguish between what marital expenditures are wasteful and self-serving and those which may be ill-advised but not so far removed from "normal" expenditures occurring previously within the marital relationship to render them destructive.

In determining whether dissipation occurred, we find trial courts should consider the following: (1) whether the evidence presented at trial supports the alleged purpose of the various expenditures, and if so, (2) whether the alleged purpose equates to dissipation under the circumstances.  ***Id***. at 420-421.  The first prong is an objective test.  To satisfy this test, the dissipating spouse can bring forward evidence, such as receipts, vouchers, claims, or other similar evidence that independently support the purpose as alleged.  The second prong requires the court to make an equitable determination based upon a number of factors. Those factors include: (1) the typicality of the expenditure to this marriage; (2) the benefactor of the expenditure, namely, whether it primarily benefitted the marriage or primarily benefitted the sole dissipating spouse; (3) the proximity of the expenditure to the breakdown of the marital relationship; (4) the amount of the expenditure.  ***Id***. at 421.

***Ward v. Ward***, No. W2001-01078-COA-R3-CV, 2002 WL 31845229, at *3 (Tenn. Ct. App. Dec. 19, 2002).

Specifically, Wife contends that the trial court erred in finding that the following did not constitute a dissipation of marital assets: (1) the $4,000,000.00 payment and charitable gift of the Hewson-Memphis partnership made by Husband pursuant to the Williams-Sonoma settlement agreement; and (2) the $233.819.14[14] in attorney's fees incurred and paid by Husband for representation in the Williams-Sonoma civil lawsuit.

---

[14] The trial court calculated Husband's attorney's fees at $207,277.50.

Applying the standard set forth in *Ward*, we first consider whether the $4,000,000.00 payment and charitable gift made by Husband pursuant to the settlement agreement amounted to a dissipation of marital assets, thereby entitling Wife to an additional award of marital property. The parties do not dispute that Husband's $4,000,000.00 payment and charitable gift were relinquished for the purpose of satisfying the conditions of the settlement agreement. Therefore, we proceed to the second prong of the *Ward* analysis, and consider whether Husband's payment and gift constituted a dissipation of marital assets in light of the four factors introduced by the *Ward* court.

Under the first factor, we find that Husband's payment and charitable gift were not expenditures typical to the parties' marriage. Although Husband was the subject of a separate but related criminal investigation at the time of the trial in this matter, there is no evidence that payment of civil or criminal penalties, settlement agreements, or lawsuits was typical to the marriage.

With regard to the second factor, Wife contends that the expenditures made by Husband in accordance with the settlement agreement were made solely for Husband's benefit. In reaching this conclusion, Wife notes that she was never a party to the Williams-Sonoma lawsuit and further suggests that she did not benefit "from the acts complained of by Williams-Sonoma against [Husband] and Ms. Payne in the Complaint for Damages alleging rescission of contract, conversion, money had and received, fraud, conspiracy to defraud, unjust enrichment, and breach of fiduciary duty."

We disagree with Wife's assertion that she did not benefit from Husband's payment and gift under the settlement agreement. Recognizing that Wife was not a party to the lawsuit, nor was she directly or indirectly involved with the underlying wrongful conduct, the evidence is nonetheless undisputed that Wife knew of Husband's involvement in Pro Trans and further received significant financial benefits as a result of Husband's business venture and his lucrative employment with Williams-Sonoma. According to his business arrangement with Bill Norris, Husband received a fifty percent share of Pro Trans's annual profits. Husband testified that the profit total varied, but acknowledged that his annual share totaled more than $200,000.00 on at least one occasion.[15] Moreover, there is no evidence in the record, aside from payments and gifts made in accordance with the settlement agreement, that Husband's involvement in Pro Trans resulted in financial loss to his family.

Husband offered unrefuted testimony that his family benefitted financially from his involvement in Pro Trans. Husband testified that Pro Trans allowed his family to maintain a privileged lifestyle, as profits from the business funded racquet club memberships, cars for the parties' children, and provided extra family income. Additionally, because Wife was not employed

---

[15] When questioned about his annual profit share in Pro Trans, Husband testified:

> [I]n our early years – some of the early years, we didn't have but a little profit. But as we grew, the profits went from anywhere – my share, from [$]90,000 to up over [$]200,000 in our better years.

outside of the home, Husband's compensation from Williams-Sonoma and his profit share from Pro Trans provided the only income for the parties' family.

Having found that Wife directly benefitted from the business venture that led to the breach of fiduciary duty claim upon which the settlement agreement was based, we also find that Wife benefitted from and consented to the expenditures made pursuant to the settlement agreement. Finalized on December 10, 1999, the Williams-Sonoma settlement agreement provided that the entire $4,000,000.00 payment be allocated to the corporation's ninth cause of action for Unjust Enrichment and Breach of Fiduciary Duty, stemming from Husband's involvement in Pro Trans. As such, no part of the $4,000,000.00 was assigned to any of the corporation's other eight claims against Husband. Husband asserts that Wife benefitted from the settlement agreement expenditures as said expenditures helped to preserve the parties' estate.[16] We are inclined to agree.

Entered as an exhibit at trial, Williams-Sonoma's First Amended Complaint sought punitive and exemplary damages as to five of the eight causes of action levied against Husband. The corporation's First Amended Complaint also sought compensatory damages on each of the eight claims in excess of $500,000.00. In its amendment to this First Amended Complaint, Williams-Sonoma added claims for compensatory, punitive, and exemplary damages based on Husband's breach of fiduciary duty, resulting from his involvement with Pro Trans.

Considering the corporation's multiple claims for damages, both compensatory and punitive, we find that it is entirely possible that the Williams-Sonoma litigation, had it proceeded to trial, could have depleted the parties' estate by more than the amount settled upon by the parties. Moreover, Husband and Wife's willingness to settle appears to indicate an acknowledgment that a trial of the Williams-Sonoma suit could have proven even more costly to the Earley family. Furthermore, we note that the parties satisfied the $4,000,000.00 payment required by the settlement agreement in its entirety by "paying back" Williams-Sonoma stock options. As such, the parties acted in full compliance with the settlement agreement without further depleting marital funds or being forced to sell the marital home or any other substantial marital assets. For these reasons, we are persuaded that the expenditures made in accordance with the settlement agreement provided insurance against further depletion of the parties' estate, thereby constituting a benefit to the marriage, and not just Husband as the "dissipating" spouse.

Finally, with regard to the second *Ward* factor, we note that Wife affixed her signature to the settlement agreement, thereby authorizing and consenting to the expenditures made in accordance thereto. The fact that Wife was required to sign the settlement agreement indicates to this Court that Wife had a significant interest in the resolution of the Williams-Sonoma suit. Therefore, we are unable to conclude that the expenditures made pursuant to the settlement agreement, especially in light of Wife's signature authorizing and consenting to such expenditures, were not made for the primary purpose of benefitting the parties' marriage.

---

[16] Wife's reply brief recognizes that settlement of the controversy with Williams-Sonoma prevented greater liability and loss of marital assets.

The third factor in *Ward* requires a court to consider the proximity of the expenditures to the breakdown of the marital relationship. It is undisputed that Husband began an extramarital affair with Ms. Payne in 1993. Husband's on-again-off-again relationship with Ms. Payne continued through December 10, 1999, the date of the settlement agreement, and was still intact at the time of trial in this matter. From the record, it is apparent that Wife was aware of Husband's marital indiscretions years prior to the settlement agreement.

The record indicates that Husband and Wife were still living together at the time of the settlement agreement and expenditures. Wife testified that the parties were attempting to reconcile at the time of settlement.[17] Husband acknowledged that the parties were attempting to reconcile at the time of the settlement, and added that they attended church and counseling sessions together in an effort to mend their marital relationship.

Wife offered conflicting testimony as to whether she had entertained thoughts of divorce prior to meeting with her attorney, Mr. Lathram. Wife conceded, however, that she never discussed or considered discussing the possibility of divorce in her meeting with Mr. Lathram. Wife did not file her Complaint for divorce until June 12, 2000, approximately six months after the Williams-Sonoma lawsuit was settled, and several years after first learning of Husband's affair.

---

[17] On cross examination, Husband's counsel questioned Wife as to the steps taken by the parties to reconcile:

> Q: All right. All right, Ms. Earley. And you and your husband were actually in counseling for probably a year or two before the Williams-Sonoma lawsuit, were you not?
>
> A: Yes.
>
> Q: And during that counseling, your husband acknowledged that he had an affair with Bobbye Payne; correct?
>
> A: Yes.
>
> Q: And you and your husband attempted through counseling and other means to try to work out your relationship; correct?
>
> A: Yes.
>
> Q: And once again, that continued through the Williams-Sonoma lawsuit, as you all were together during that lawsuit up to the time it was settled; correct?
>
> A: Yes.
>
> Q: And then you stayed together for some time after that?
>
> A: Yes.

While it is apparent that the parties' marital relationship began to break down the moment Husband began his affair with Ms. Payne, we are unable to make a finding of dissipation based on this factor in light of the particular facts of this case. We find no evidence that the expenditures mandated by the settlement agreement were motivated by or related to the breakdown of the parties' marriage. We are further convinced that Husband's involvement in Pro Trans was premised solely on Husband's concern for his own financial stability, and that of his family. While we do not find that dissipation requires an intent to dissipate, we are unwilling to find that the expenditures made by Husband in an effort to preserve the greater part of the marital estate while attempting to save the marriage constitutes dissipation of marital assets. Concerning the third *Ward* factor, we note Husband's reliance on the decision of the Illinois Supreme Court in *In Re Marriage of O'Neill*, 563 N.E.2d 494 (Ill. 1990), where the Court construed the Illinois statute dealing with distribution of marital property requiring that, among other things, dissipation of assets by each party is a factor to be considered in distributing marital property. This statute is similar to the Tennessee statute dealing with the same subject. In *O'Neill*, the Court stated:

> We therefore hold that the term "dissipation," as used in section 503 (d)(1) of the Illinois Marriage and Dissolution of Marriage Act, refers to the "use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown."

*Id.* at 498-99 (citations omitted).

Husband asserts that the evidence in the record preponderates against a finding that the parties' marriage was undergoing an irreconcilable breakdown, citing to evidence that the parties were still living together at the time of the settlement agreement expenditures, were participating in marriage counseling, and even attended church together. While we find that the evidence relied upon by Husband strongly suggests that the parties were putting forth every effort to reconcile at the time of the settlement agreement expenditures, we are unwilling to adopt the definition set forth by the Illinois Supreme Court requiring a finding of an irreconcilable breakdown. *Ward* sets forth no requirement of irreconcilability, and we find no case law in Tennessee explicitly providing for such requirement.

The final *Ward* factor requires a reviewing court to consider the total amount of the expenditure(s) in determining whether said expenditure(s) constituted a dissipation of marital assets. It is undisputed that Husband made a $4,000,000.00 payment to Williams-Sonoma in accordance with the settlement agreement. Although the parties offered conflicting testimony as to the purported value of the Hewson-Memphis Partnership, it is apparent from the record that the partnership represented a substantial financial worth to the parties. However, in recognizing the substantial value of the parties' marital estate, and considering the fact that the payments made by Husband to Williams-Sonoma represented less than fifty percent of the parties' total estate, we find that the

payments, under the circumstances of this particular case, were not so as to require or suggest a finding of dissipation.

In weighing the *Ward* factors, as they apply to the facts in this case, we find that the $4,000,000.00 expenditure and charitable gift made by Husband pursuant to the settlement agreement do not constitute a dissipation of marital assets. We premise our decision specifically upon our findings with regard to the second, third, and fourth factors set forth in *Ward*. Having found that Wife directly benefitted from the expenditures, and that said expenditures were not related to or the product of the breakdown of the parties' marital relationship, we are unable to conclude that these expenditures were a dissipation of marital assets.

The final issue presented for review before this Court is the question of whether the attorney's fees incurred and paid by Husband in exchange for services rendered in the Williams-Sonoma civil lawsuit constitute a dissipation of marital assets. In his ruling from the bench denying Wife's claim for inclusion of the Williams-Sonoma attorney's fees in the dissipation total, the trial judge stated:

> The real issue for me is whether or not then to add the $207,277.50 in attorney fees that were paid in connection with the civil suit to the dissipation. And I find that the civil – preparation for defense of and settlement of the civil suit was something Ms. Earley knew about all along.
>
> It is certainly not a commendable course of action that gave rise to the civil case, but I don't think that it amounts to legal dissipation, so I'm not going to include the $207,277.50 in the dissipation figure. Therefore, the figure I come up with for the amount that was dissipated is [$533,145.74].

Wife asserts that the trial court erred in refusing to include Husband's attorney's fees in the dissipation total. In presenting this argument, Wife relies heavily on a footnote contained in the case of *Pennington v. Pennington*, No. W2000-00568-COA-R3-CV, 2001 WL 277993 (Tenn. Ct. App. Mar. 14, 2001). In *Pennington*, a divorce case involving child support and marital property issues, Mr. Pennington was a former doctor who had been arrested and convicted several times for drug-related offenses, including possession of cocaine and illegally writing prescriptions for controlled substances. *Id*. at *1. Mrs. Pennington filed for and was awarded an absolute divorce on the grounds of inappropriate marital conduct and adultery. *Id*. at *1-2. In dividing the parties' marital property, the court considered evidence of the husband's dissipation of marital assets. *Id*. at *2. The appellate court included the following footnote with regard to the trial court's findings as to dissipation:

> The trial court cited the following as examples of Mr. Pennington's dissipation of assets: (1) $3,200 in attorney's fees for one of the women with whom Mr. Pennington was having an affair,

-14-

and (2) thousands of dollars in attorney's fees for Mr. Pennington's various legal infractions.

*Id*. at *2 n.6.

The appellate court made no other reference and engaged in no further analysis of Mr. Pennington's alleged dissipation.

Based on our reading of *Pennington*, and in consideration of the factors set forth in *Ward*, we find that the attorney's fees incurred by Husband, under the specific facts of this case, do not constitute a dissipation of marital assets. Addressing first Wife's assertion that *Pennington* requires a finding of dissipation, we note that the issue of dissipation was not before or considered by the *Pennington* court. Further, the appellate court did not provide a sufficient factual background with regard to the legal charges for which Mr. Pennington incurred "thousands of dollars in attorney's fees," thereby preventing us from accurately comparing and/or analogizing *Pennington* with this particular case. Finally, we note that the legal infractions referred to in *Pennington* appear to be strictly criminal in nature. In contrast, the nine counts listed in Williams-Sonoma's complaint, and specifically the corporation's action for breach of fiduciary duty, were initiated as part of a civil lawsuit. We are unwilling to interpret or apply *Pennington* as a blanket rule that attorney's fees incurred in a civil lawsuit, by and as a result of the legal indiscretions of a single party to the marital relationship, necessarily constitute a dissipation of marital assets.

Applying the factors set forth in *Ward*, we reiterate our finding that the attorney's fees incurred by Husband do not constitute a dissipation of marital property. With regard to factor two, whether the expenditure "primarily benefitted the marriage or primarily benefitted the sole dissipating spouse," we note that the attorney's fees at issue in this case were incurred solely for Husband's defense in the Williams-Sonoma lawsuit. Although the fees were incurred for Husband's defense, Wife also benefitted from this expenditure when considering that the parties, both Husband and Wife, were able to reach a settlement agreement in a lawsuit that could have resulted in a substantially greater financial loss to the parties' estate. We reiterate that Husband's involvement in Pro Trans was premised on a desire to increase the financial resources of his family. As for the expenditures made and fees incurred as a result of the settlement agreement and lawsuit, we find that all such expenditures and fees were paid for the purpose of preserving the marital estate. Moreover, we find that Wife admitted that she knew Husband had retained counsel to represent him in the Williams-Sonoma litigation, and authorized and consented to the terms of the settlement agreement by affixing her signature. Because Husband was the sole financial provider for the family, it is unlikely that Wife was unaware that marital funds were being used to secure representation in the Williams-Sonoma lawsuit.

The evidence in the record does not preponderate against the trial court's finding that the attorney's fees paid by Husband in connection with the Williams-Sonoma lawsuit and the settlement thereof do not constitute a dissipation of marital property.

The decree of the trial court is affirmed and the case is remanded for such further proceedings as necessary.  Costs of this appeal are assessed against Kathleen Anne Earley and her sureties.


_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.